167 N.J. Super. 237 (1979)
400 A.2d 813
IN RE MIDLAND INSURANCE COMPANY.
Superior Court of New Jersey, Appellate Division.
Argued February 27, 1979.
Decided March 22, 1979.
*241 Before Judges MATTHEWS, KOLE and MILMED.
Mr. Roger H. McGlynn argued the cause for appellant (Messrs. Lum, Biunno & Tompkins, attorneys).
Ms. Maureen McGrath, Deputy Attorney General, argued the cause for respondent (Mr. John J. Degnan, Attorney General of New Jersey, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel).
The opinion of the court was delivered by KOLE, J.A.D.
Midland Insurance Company (Midland) appeals from a determination of the Commissioner of Insurance (Commissioner) imposing fines in the sum of $79,000 and ordering it to cease and desist from certain practices. These actions were based on Midland's failure to satisfy judgments and forfeitures on its bail bond obligations within a reasonable period of time.
In July 1976 an order to show cause, later amended, was issued by the Department of Insurance (Department) with respect to possible violations of the State's insurance laws arising out of Midland's failure to make prompt payment of its bail bond obligations, involving forfeitures and judgments, in violation of the insurance laws.
Hearings on the order were held before an examiner, during the course of which many counts were withdrawn by the Department, leaving 241 charges. Most of the charges involved unpaid judgments, and forfeitures without judgments, for which a penalty was sought under N.J.S.A. *242 17:33-2 for violations of N.J.S.A. 17:32-2(b); others sought a cease and desist order involving violations of N.J.S.A. 17:29B-4(9) (f) and (g). The last day on which hearings were conducted and evidence received was December 9, 1976. Some four months later the examiner heard closing arguments. At that time, and somewhat earlier, Midland moved to supplement the record with evidence relating to subsequent court action taken to vacate some of the judgments underlying the charges. This motion was denied.
The evidence at the hearing was substantially the same for each count, except to the extent that forfeitures differ from judgments. The Department introduced on each count evidence of the entry of bench warrants and orders of forfeiture when a person bonded by Midland failed to appear, notices to Midland of the forfeitures, and in the case of judgments, notices of motion for judgment, the judgments themselves and notices thereof to Midland. The Department showed the length of time which had elapsed between the time of entry of an order of forfeiture or judgment and the time of actual monetary satisfaction thereof. In many instances payment resulted after the issuance of the initial order to show cause in July 1976. Of the 241 counts remaining after the hearings, most of them related to unpaid judgments; the balance involved unpaid forfeitures.
The testimony revealed that while differences exist among the various counties and courts insofar as record keeping with respect to bail bonds is concerned, the procedure for declaration of forfeiture and entry of judgment thereon is essentially the same. When a defendant fails to appear on the prescribed date, the judge orally declares that a bench warrant issue and either on his own motion or on motion of the prosecutor enters an order declaring forfeiture of the bond. The bondsman  the surety's agent  and the surety are then notified of the forfeiture and a demand for payment is made. If payment is not forthcoming, a notice of motion for the entry of a judgment on the forfeiture is sent to the surety and judgment is thereafter obtained. The *243 surety is then notified of the judgment and payment is again requested.
The evidence disclosed, however, substantial differences in the time lapse between the various steps taken leading up to final judgments. In some cases the order of forfeiture was not entered until many months after the issuance of the bench warrant, presumably around the date of a defendant's failure to appear. Similarly, many months often elapsed between the entry of the order of forfeiture and the entry of judgment.
These delays apparently stem from the informal nature of the bail bonding procedure, rooted in common law tradition. For example, there was testimony at the hearing that when a defendant does not appear in municipal court, the judge notifies the bondsman by telephone and a later forfeiture apparently is declared.[1] In county trial courts, notification of the failure to appear may come by mail about one week after the appearance date. The order of forfeiture usually is not entered immediately upon defendant's failure to appear; the judge merely issues a bench warrant. Subsequently, after a reasonable time has been allowed for locating the defendant, the prosecutor moves for the entry of an order of forfeiture by formal motion. After a hearing thereon the judge declares a forfeiture and the county counsel then moves to enforce it by reducing it to a civil judgment. There appears to be no uniformity in the State with respect to the time interval between declaration of forfeiture and entry of judgment.
In 1972 the Administrative Director of the Courts, in a memorandum, prescribed that upon breach of the condition of the recognizance the prosecutor or the court, on its own motion, move for declaration of forfeiture; that notice thereof and demand for payment immediately be sent to the bondsman and surety; that if the amount of the bond were not *244 paid or if the forfeiture were not set aside within 20 days, county counsel was to collect the forfeiture by moving for entry of judgment. At least two counties, Passaic and Monmouth, employ this so-called "20 day rule."[2] As to municipal courts, the memorandum requires the clerk of the court, after declaration of a forfeiture, to send the matter to the county authorities and directs the county officials to take further action with respect to enforcement thereof in accordance with the procedure applicable to county trial court forfeitures.
After entry of an order of forfeiture, but prior to the entry of judgment, if a defendant is apprehended or his whereabouts are discovered, the surety may move for vacation of the forfeiture and remission of the monies paid. The court may retain that portion of the payment necessary to cover the expenses incurred in locating or apprehending defendant. According to Midland's evidence, this exoneration of the forfeiture and remission of payment is very common; but even if defendant is located, only a relatively small number of judgments are vacated and payment thereon remitted.
The examiner concluded that defendant had perpetrated 135 violations of N.J.S.A. 17:32-2(b) in that it failed to satisfy its obligations on 135 judgments within six months of the entry thereof. He was of the view that in this case, six months was a reasonable period for that purpose. He concluded that N.J.S.A. 17:32-2(b) established an ongoing requirement which must be met by all foreign insurance companies doing business in the State, and that N.J.S.A. 17:33-2 authorized the imposition, in this case, of a monetary penalty. He recommended the levying of fines on *245 these 135 charges ranging from $500 to $2,000, depending on the length of time between entry of judgment and payment. The aggregate fine recommended for these violations was $94,500.
Although the examiner found that a forfeiture imposed upon the surety an obligation to pay, he noted that the municipalities and counties also have an obligation to enforce the collection of a forfeiture through the entry of a judgment under R. 3:26-6, and that in many cases this was not done. Accordingly, he recommended that in this case no guilt be found or fine imposed for failure to make timely payments on forfeitures not reduced to judgment and that the counts relating solely to forfeitures be dismissed.
The examiner then dealt with the issue of whether a cease and desist order should be entered by reason of Midland's alleged unfair claim settlement practices under N.J.S.A. 17:29B-4(9)(f) and (g). As to forfeitures only, he determined that since the counts relating thereto were dismissed, the matter of whether they violated N.J.S.A. 17:29B-4(9)(f) was moot. Hence, he recommended that no cease and desist order relating thereto should issue.
He also recommended dismissal of the charge alleging a violation of N.J.S.A. 17:29B-4(9)(g), since he found that this provision was directed towards the casualty field and had no application in the context of bail bonds. He further recommended that there be no revocation of Midland's license, given its good faith effort to satisfy its obligations, its cooperation with the Attorney General and the examiner in the proceedings, and the public interest in continued service by bail bond companies.
The Commissioner adopted much of the examiner's report. However, he dismissed the counts involving individual unpaid judgments in which the underlying forfeitures were vacated before judgment, one involving a judgment erroneously listed twice and one based on the bond of another surety. He found failure to pay forfeitures not reduced to judgments to constitute violations of N.J.S.A. 17:32-2(b) *246 in the instant case, and thus refused to dismiss the charges relating thereto; but he levied no fines therefor, since the penalties imposed for not paying judgments were deemed to be sufficient as a deterrent. He also dismissed other counts alleging nonpayment of forfeitures only, except one which formed the basis of his cease and desist order.
As a result of the Commissioner's actions, the total fine imposed was reduced from $94,500 to $79,000. He used a formula in which a $1,000 fine was levied on judgments unpaid for one year or more and $500 on judgments unpaid for six months to one year. The Commissioner further found that Midland had violated N.J.S.A. 17:29B-4(9)(f) and (g) and ordered it to cease and desist from further violations.
This appeal followed. Defendant seeks reversal of the Commissioner's action on a number of grounds.

I
Midland claims that it is inappropriate to impose liability for the conduct involved herein on N.J.S.A. 17:32-2(b).
N.J.S.A. 17:32-1 et seq. deals generally with foreign insurance companies who have been licensed to do business in this State. N.J.S.A. 17:32-2 prescribes prerequisites to admission of a foreign carrier. N.J.S.A. 17:32-2(b) specifically provides that the Commissioner must be satisfied that "[the carrier's] condition or methods of operation are not such as would render its operation hazardous to the public or its policyholders in this State; * * *," The Commissioner is empowered under chapter 32 to refuse to renew a certificate to operate in this State, N.J.S.A. 17:32-2(d), and to revoke such a certificate if, among other things, the company "fails to comply with any provision of law obligatory upon it." N.J.S.A. 17:32-14. Our reading of these provisions, as well as the others contained in chapter 32, leads us to conclude that they plainly contemplate that the *247 requirements set forth in N.J.S.A. 17:32-2(b) be complied with as continuing obligations of the company which may be supervised and enforced by the Commissioner at any time. Cf. In re Suspension of Heller, 73 N.J. 292, 297-307 (1977).
Midland is a licensed foreign insurance company admitted under chapter 32 and subject thereto. There is no doubt that Midland's failure to satisfy its surety obligations promptly constitutes conduct of its operations in a manner hazardous to the public and holders of its surety bonds. The public interest is thereby clearly adversely affected. See State v. Peace, 63 N.J. 127, 129 (1973). Thus, to the extent that Midland has engaged in practices hazardous to the public and its bondholders, it has acted beyond the scope of its licensed authority under, and has violated, N.J.S.A. 17:32-2(b).
Accordingly, Midland's claim that it is improper to impose liability on the basis of this provision is without merit.

II
Midland contends that there is no authority for the imposition of a monetary penalty against it. It claims that the exclusive remedy here is injunctive relief, as provided in N.J.S.A. 17:32-20.
Contrary to Midland's assertion, N.J.S.A. 17:32-20, which provides a judicial forum for violations of "the provisions of this act" through an action instituted by the State for an injunction and "for such other relief as may be appropriate under the circumstances," is not the exclusive remedy available for the violations here involved.
N.J.S.A. 17:32-2(b), upon which liability is based here, is found in subtitle 3 of Title 17 of the Revised Statutes. Sub-title 3 covers, generally, N.J.S.A. 17:17-1 to 17:51-5. A general penalty provision governing this subtitle is found in N.J.S.A. 17:33-2. That section provides for monetary penalties to be imposed by the Commissioner for "each violation of any chapter of this subtitle or any supplement *248 thereto," except "as in this subtitle otherwise provided." Nothing in the subtitle otherwise specifically provides for a monetary penalty for a violation of N.J.S.A. 17:32-2(b). Contrast, e.g., N.J.S.A. 17:18-18, 17:22-6.16(a), 17:22-6.25, 17:22-6.61. We note that the penalty section also excludes from its coverage the failure of a company to file an annual statement, and that N.J.S.A. 17:23-2 specifically requires a court action to obtain a penalty therefor. Thus, the imposition of a monetary penalty under N.J.S.A. 17:33-2 for a violation of N.J.S.A. 17:32-2(b) is not barred by the existence of an "otherwise provided" remedy, including N.J.S.A. 17:32-20.
In any event, to the extent that N.J.S.A. 17:32-20 may be deemed an exclusive remedy, it would be thus limited only to nonadmitted foreign carriers, unlike Midland, which do not have a certificate of authority to do business here. What is now N.J.S.A. 17:32-16 to 22 was enacted in 1968 (L. 1968, c. 234) as "An Act concerning the transaction of the business of insurance by nonadmitted insurers * * *" (hereafter Nonadmitted Insurers Act). This act was basically intended as remedial legislation in order to subject nonadmitted insurers to the laws governing all foreign insurers doing business in this State. N.J.S.A. 17:32-16. The statutory provision, which is now N.J.S.A. 17:32-20, refers specifically to violations of this act, referring to the Nonadmitted Insurers Act itself. In all likelihood, the retionale for the requirement of N.J.S.A. 17:32-20 that an action commence in Superior Court, rather than before the Commissioner, is the Commissioner's lack of jurisdiction over unlicensed companies. Additionally, N.J.S.A. 17:32-20 refers to the method of serving process on companies covered thereby  through the use of N.J.S.A. 17:51-1 et seq. involving insurers not authorized to transact business in this State.[3]
*249 Accordingly, the Commissioner's imposition of a monetary penalty under N.J.S.A. 17:33-2 for the violations of N.J.S.A. 17:32-2(b) was proper.

III
Midland claims that the Commissioner's determination erroneously founded liability on the failure to pay forfeitures, even though under the circumstances here he imposed no penalties therefor. It asserts that there is no legal obligation to pay mere forfeiture orders and, accordingly, the failure to do so cannot amount to a statutory violation.
The procedures relating to the declaration of forfeitures and judgments on bail bond obligations are set forth in R. 3:26-6. That rule states:
Forfeiture
(a) Declaration. Upon breach of a condition of a recognizance, the prosecuting attorney shall move the court for a declaration of forfeiture of the bail, and the clerk of the court shall forthwith send notice of the forfeiture to the county counsel or the municipal attorney, as appropriate, who shall forthwith proceed to collect the forfeited amount.
(b) Setting Aside. The court may direct that a forfeiture be set aside if its enforcement is not required in the interest of justice upon such conditions as it imposes.
(c) Enforcement; Remission. When a forfeiture is not set aside, the court shall on motion enter a judgment of default and execution may issue thereon. After entry of such judgment, the court may remit it in whole or in part in the interest of justice.[4]
In addition, R. 3:26-7 provides:

*250 Exoneration

When the condition of the recognizance has been satisfied or the forfeiture thereof has been set aside or remitted, the court shall exonerate the obligors and release any bail. A surety may be exonerated by a deposit of cash in the amount of the recognizance or by a timely surrender of the defendant into custody.
The subject of forfeitures and bail bond procedures was discussed in detail in State v. Singletary, 153 N.J. Super. 505 (Law Div. 1977), rev'd o.g., 165 N.J. Super. 421 (App. Div. 1979). We agree with the conclusion reached in that case, essentially for the reasons expressed therein, that the bail bond encompasses the terms of the agreement of the parties  a defendant, his surety and the State , the amount of indebtedness and the conditions for appearance which, if met, would void the debt; and that if the conditions are not met, both defendant-principal and bail-surety become absolute debtors of the State in the amount of the bond.
However, despite such absolute liability in the event of the failure of a defendant to appear in accordance with the terms of the bond, as a matter of fairness we hold that the liability may not be enforced against the surety until a court declares the bond forfeited and after due notice of such forfeiture has been given to the surety. Once such notice is given, payment of the bond is due within a reasonable time thereafter, whether or not a judgment is subsequently entered, unless, of course, relief is granted prior to payment pursuant to R. 3:26-6(b). Thus, irrespective of the Commissioner's action in the present case, henceforth the crucial date on which a payment of a bail bond is due is the date upon which a forfeiture is declared in accordance with R. 3:26-6(a) and notice thereof is duly given the surety. This is the rule which should guide bail bond surety companies in the future in order that they may not be deemed to be violating N.J.S.A. 17:32-2(b) in the event circumstances warrant proceedings for such violations. For purposes of determining whether such a violation exists, awaiting entry of a judgment can no longer constitute justification for withholding *251 payment of a bond where the surety company has been given due notice of its forfeiture.
What we have said, of course, in no wise precludes a surety from seeking to set aside a forfeiture or remission of a judgment in whole or in part under R. 3:26-6(b) or (c), where such relief is warranted in the interest of justice. See, generally, State v. Erickson, 154 N.J. Super. 201 (App. Div. 1977); State v. Fields, 137 N.J. Super. 79 (App. Div. 1975); State v. Hyers, 122 N.J. Super. 177 (App. Div. 1973).
We are satisfied that in view of the lax and uneven bail bond collection procedures in the State prior to the Commissioner's determination, in the interest of justice he should have followed the examiner's recommendation that the charges against Midland relating to nonpayment of forfeitures not reduced to judgment should be dismissed. Thus, the Commissioner's finding of liability for these charges under the circumstances of this case, even though he imposed no penalty therefore, was erroneous and must be reversed.

IV
Midland claims that it was error for the examiner to refuse, some four months after the conclusion of testimony, to permit supplementation of the record by it to include evidence that 38 of the judgments upon which liability was eventually predicated were vacated by the courts. The examiner refused to receive this evidence, apparently on the grounds that (1) the State would not have an opportunity to test it through crossexamination and (2) the proceeding, which had been in progress for over eight months, had to be closed at some point. The Commissioner found no merit to the argument that no fine should be levied because some judgments were later vacated.
We are satisfied that the question of whether the record should have been supplemented at that late date was a matter within the sound discretion of the examiner and *252 Commissioner, and that such discretion was not improperly exercised. See In re Gastman, 147 N.J. Super. 101, 112-114 (App. Div. 1977). Since Midland continued to dispose of judgments during the course of the hearing before the examiner, allowing supplementation of the record in this respect might well have severely impaired a reasonably final consummation of the administrative proceedings. Additionally, the vacation of these judgments would not alter Midland's liability in this case, since that is based on its failure to pay them within a reasonable time. Even if the judgments were later vacated, Midland still had the responsibility to have made payment thereon promptly and to have sought remission in the case of any subsequent vacation. Failure to do so is the practice hazardous to the public and bondholders. At best, the new evidence would merely show the curative steps taken by Midland only after being faced with these proceedings. As the Commissioner properly stated, it is also a hazardous method of operation not to move to vacate judgments promptly, and "it is imperative for examination and solvency determination purposes for the regulator to be able to have an accurate account of a company's liabilities."

V
The Commissioner found that Midland violated both N.J.S.A. 17:29B-4(9)(f) and (g) by engaging in a practice of not paying forfeitures and judgments promptly and by offering to settle forfeitures for substantially less than that recovered after entry of judgment. Midland was ordered to cease and desist from these practices. See N.J.S.A. 17:29B-7(a).
Midland claims that these statutory provisions, involving unfair claims settlement practices, do not apply to bail bond companies.
From what we can determine from the record, the violations involving N.J.S.A. 17:29B-4(9)(f) (hereafter (9) *253 (f)) were based on failure to pay judgments and forfeitures, and the violations of N.J.S.A. 17:29B-4 (9) (g) (hereafter (9)(g)) were predicated on the fact that the municipalities and counties were required to reduce the forfeitures to judgments by reason of Midland's failure to pay the forfeitures.[5]
A violation under (9)(f) occurs where an insurance company as a general business practice fails to attempt in good faith a prompt and fair settlement of claims in which liability is reasonably clear. The provision places an obligation on these companies to engage in affirmative good faith conduct in settling claims. Such an obligation appears warranted in the case of all insurers, including bail bond companies. The provision applies generally to all insurance companies except those authorized to do business in life insurance, health insurance or annuities, which have been explicitly exempted therefrom by N.J.S.A. 17B:36-3(c). See also, N.J.S.A. 17:31-1 to 17:31-5 relating to surety companies. There is no specific exemption relating to sureties generally or to bail bond sureties specifically. Thus, the statute imposes a burden on Midland to attempt to settle promptly reasonably clear claims against it.
The "claims" forming the basis of the charged violations of (9)(f) are forfeitures and judgments. With respect to judgments, the Commissioner correctly found liability under this provision. As the record discloses, there were numerous judgments which were not paid within a reasonable time, thus evincing a frequency of performance rising to the level of a general business practice. Contrary to Midland's suggestion, once a judgment had been entered, *254 liability on the bond was absolute and clear. The possibility of later vacation and remission of payment in whole or in part is within the discretion of the court. Midland's failure to engage in prompt affirmative conduct in either paying the judgment or moving for its vacation supports a conclusion that it failed to make a good faith attempt "to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." (9)(f). Indeed, in most cases it took no affirmative steps with respect to these claims at all. It failed to answer the notices of forfeiture and of motions for judgment and failed to appear when the latter were being heard. Thus, the Commissioner's finding of liability in this regard as to judgments and the resulting order to cease and desist must be affirmed.
What we have said with respect to liability on unpaid forfeitures not followed by judgments in the present case, applies as well in the context of liability under (9) (f). Hence, we have concluded that the cease and desist order under (9)(f), issued by the Commissioner, should be reversed to the extent it involves failure to pay such forfeitures and that the charges relating thereto under (9)(f) should be dismissed.
We reverse that part of the cease and desist order that is predicated on conduct allegedly violative of (9)(g). A violation of (9)(g) requires a showing of a general business practice of compelling "insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds."
We need not determine whether this provision is limited to the casualty field, as concluded by the examiner. See discussion, supra, as to (9)(f).
The Commissioner's determination that (9)(g) had been violated by Midland's failure to pay forfeitures, thus compelling the government entity involved to reduce them to judgments, is plainly erroneous. That provision expressly requires an offer substantially less than the amounts ultimately *255 recovered in actions by the insured. Indeed, the benchmark for liability under (9)(g) is the amount of the offer itself, since no liability arises unless the offer is substantially less than the recovered amount. The Commissioner made no specific reference to the February 23, 1976 offer to settle made by Midland to Camden County. There is no other evidence that Midland ever made offers, after forfeiture and prior to judgment, which were substantially less than the recovered amounts. Assuming such offers were made, neither the Commissioner nor we have any basis in the record to decide whether the offers were substantially less than the recovered amounts.
Even if the Camden County settlement offer is considered, there is no basis for a (9)(g) violation. A large majority of the counts involved in the offer to settle were reduced to judgments prior thereto, and it is unclear whether the remaining counts relating to forfeitures were ever reduced to judgment. Thus, it cannot be said that the offer compelled the insured to institute litigation. Additionally, while the offer embraced numerous unpaid forfeitures and judgments, it is probably best characterized as a single offer to settle. Hence, it cannot be said that this conduct was engaged in by defendant "with such frequency as to indicate a general business practice" as required by (9)(g).

VI
Midland claims that the fine of $79,000 is excessive and unduly harsh, given the circumstances of this case. It cites its remedial conduct, cooperation with the State, the fact that this is its first offense, and the fact that a substantial number of the charges resulted from the lack of conscientious conduct on the part of one agent, Edward Goldsmith, as factors militating against the severity of the punishment imposed.
The formula adopted by the Commissioner for imposing the penalties under N.J.S.A. 17:33-2 were well within his *256 authority thereunder and constitutes an appropriate exercise of discretion. We see no basis upon which to disturb his determination in this respect, particularly in view of the limited scope of our review and the deference to be given to an administrative agency charged with enforcing the law. See Knoble v. Waterfront Comm'n of N.Y. Harbor, 67 N.J. 427, 431-432 (1975); State v. Elmwood Terrace, Inc., 85 N.J. Super. 240, 251 (App. Div. 1964).
We note that while the total amount of the penalty is substantial  $79,000, Midland's repetitive offenses are serious. The Commissioner's concern was that the fine imposed be severe enough to act as a deterrent to future violations of this sort and the aggregate penalty levied appears to further that purpose. We are satisfied that the mitigating circumstances alleged by Midland were considered by the Commissioner and reflected in the ultimate penalty imposed.

VII
The Commissioner's conclusions that (1) Midland is liable under N.J.S.A. 17:32-2(b) for failure to pay bond forfeitures not resulting in judgments; (2) Midland cease and desist from violating N.J.S.A. 17:29B-4(9)(f), with respect to such forfeitures, and (3) Midland cease and desist from violating N.J.S.A. 17:29B-4(9)(g), are reversed. In all other respects the Commissioner's determination is affirmed.
NOTES
[1] The actual practice with respect to entry of judgments arising from municipal court forfeitures is not clear from the record.
[2] Essex County apparently has its own written rule with respect to payment and remission. The bonding company is required to pay on notice of forfeiture without there being an entry of judgment. Thereafter, there is an almost automatic right of remission of the entire bond if the defendant is reremanded, less costs to the county and usually a 10% penalty.
[3] Although, as discussed above, N.J.S.A. 17:32-20 was designed for nonadmitted insurance companies, conceivably it may also justify resort to the courts by the Commissioner for relief from hazardous operations by a licensed foreign carrier. We note that the statute on which N.J.S.A. 17:32-20 is based expressly states that it is a supplement to chapter 32.
[4] N.J.S.A. 2A:162-8 provides that an application for return of monies paid must be made within four years after declaration of the forfeiture.
[5] Before us the State seems to justify the cease and desist order under (9) (g) by reason of an offer made by Midland in February 1976 to Camden County to settle its obligations by paying about 10% of the outstanding judgments and forfeitures. Since this is not the express basis for the Commissioner's decision, we essentially disregard that theory of liability.